# In the United States Court of Federal Claims

No. 24-1386
(Originally filed: October 4, 2024)
(Reissued: December 11, 2024)[1]

* * * * * * * * * * * * * * * * * * * * * * *

IGNITEACTION JV, LLC,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant*,

* * * * * * * * * * * * * * * * * * * * * * *

    *Michael D. McGill*, Washington, DC, for plaintiff, IgniteAction JV, LLC. *Thomas A Pettit*, of counsel.

    *Elizabeth M. D. Pullin*, Trial Attorney, United States Department of Justice, Civil Division, with whom were *Alexander S. Brewer*, Trial Attorney, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Jillian Stern* and *Jonathan S. Baker*, of counsel.

## OPINION AND PRELIMINARY INJUNCTION

BRUGGINK, *Senior Judge*

    This is a pre-award bid protest brought by IgniteAction JV, LLC ("IgniteAction") against the U.S. Census Bureau's ("Census Bureau") announced intention to modify a task order held by BLN, LLC ("BLN") under an existing Federal Supply Schedule ("FSS") contract. The present action is the latest in a series of related protests, all stemming from the Census Bureau's award in November 2023 of the Dissemination Systems Development and Support Services ("DSDSS") contract to IgniteAction.

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose the redaction of protected information. The parties did not propose any redactions, and thus the opinion appears in full.

That award was intended to replace and enlarge work under a preexisting contract for the Enterprise Data Dissemination Environment ("EDDE") project. The EDDE work and the anticipated DSDSS work is being done at the direction of the Census Bureau's Center for Enterprise Dissemination Services and Consumer Innovation ("CEDSCI"). MetroStar Systems, LLC ("MetroStar") is the incumbent under the EDDE contract. The award to Ignite was protested by MetroIBR JV LLC ("MetroIBR"), a mentor-protégé joint venture between Imagine Believe Realize, Inc. and MetroStar, and Capital Technology Group ("CTG"). The agency's initial effort to cancel the procurement during those protests was challenged and blocked by the court.

To maintain work under EDDE in the interim, the agency has twice awarded a sole source bridge contract to MetroStar. The latest bridge contract runs out on November 30, 2024. In an effort to maintain services beyond that date and while the agency decides the future of the DSDSS procurement, the Chief of Census' Acquisition Division issued a memorandum on August 13, 2024, announcing that the EDDE bridge work currently being performed by MetroStar would be performed by BLN pursuant to a modification to BLN's existing FSS contract awarded by Census' Center for New Media Promotion ("CNMP") within the Associate Director for Communications at the Census Bureau. Currently pending is plaintiff's motion for a preliminary injunction against that proposed modification to BLN's task order to include the EDDE bridge work. A parallel protest by MetroIBR is also pending in docket No. 24-1322. Oral argument in both cases was held on September 26, 2024, during which we announced that we would grant the request for a preliminary injunction, enjoining the agency modifying BLN's task order (Task Order No. 1333LB24F00000013) in the proposed manner. We did not specify the length of the injunction. We held a status conference on October 2, 2024 to discuss the terms of the injunction. The injunction and the reasons for it are laid out below.

## BACKGROUND[2]

I. The Bid Protest For DSDSS Services

Since September 2017, MetroStar has held the EDDE task order contract with the Census Bureau. The EDDE contract provides data

---

[2] The facts are drawn from the materials attached to defendant's opposition to the motion for a preliminary injunction, which the parties treat as the available administrative record.

dissemination services for CEDSCI under the Associate Director for Research and Methodology, enabling the Census Bureau to make census data more readily available to customers. The EDDE contract work is divided into five overarching categories, called "task areas." They are: Agile Development Framework; Development and Testing; Transition Implementation and Integration Activities; Business Operations; and Project Management. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 9, App. 198–99.

On August 28, 2023, the Census Bureau issued a Request for Quotation ("RFQ") for the DSDSS contract, which would be a follow-on task order contract to EDDE, although it includes additional, new Information Technology ("IT") support for data dissemination services. The procurement process was a small business total set-aside, and the RFQ contemplated a single task order for IT Professional Services under General Services Administration ("GSA") Multiple Award Schedule ("MAS")[3] Special Item Number ("SIN") 54151S. On November 14, 2023, after receiving quotations from various small businesses, including MetroIBR, CTG, and IgniteAction, the Census Bureau awarded the DSDSS task order to IgniteAction, a mentor-protégé joint venture between Ignite IT, LLC and ActioNet, Inc.

MetroIBR filed a protest challenging the DSDSS award to IgniteAction at the Government Accountability Office ("GAO"), alleging that the Census Bureau's evaluation of MetroIBR's and IgniteAction's quotations was unreasonable and unequal. On November 28, 2023, IgniteAction received a stop-work order due to the protest at GAO. CTG, for its part, filed a challenge in this court, which then divested GAO of jurisdiction over MetroIBR's protest. MetroIBR subsequently filed a protest here. The Census Bureau agreed to stay the DSDSS award to IgniteAction pending resolution of those protests. The agency sought to moot those protests by taking corrective action, eventually settling on cancellation of the solicitation and award as the fix, but, as mentioned earlier, IgniteAction was successful in seeking an injunction against that plan. Order Granting Permanent Injunction, *IgniteAction LLC v. United States*, No. 24-424 (Fed. Cl. June 20, 2024), ECF 51.

The initial protests by MetroIBR and CTG remain pending while the agency seeks to respond to discovery allowed by the court. *See MeroIBR JV*

---

[3] "FSS" and "MAS" are used interchangeably under FAR 8.402(a) to refer to the GSA schedule.

*LLC v. United States*, 172 Fed. Cl. 277 (2024) (granting motion to supplement the record with discovery). The EDDE work has been ongoing through two bridge contracts awarded to MetroStar.

II. The Decision To Award The Interim EDDE Work To BLN

On August 13, 2024, the Census Bureau issued a Short-term Acquisition Memorandum indicating its plan to continue EDDE bridge services by attaching those services to an existing task order held by BLN under a separate GSA FSS task order contract. BLN's task order would be modified to include EDDE support services by September 30, 2024, to allow for a 60-day transition period between MetroStar and BLN. BLN's existing task order, Task Order No. 1333LB24F00000013, is for "Digital Web Services," providing the CNMP with "web development and data visualization support and integration services for existing and future Census needs." Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 5, App. 23. The original procurement for this task order was also limited to MAS contractors under SIN 54151S.

The Short-term Acquisition Memorandum was prepared by Christopher Henshaw, Chief of the Census Bureau's Acquisition Division. Mr. Henshaw relied on an August 1, 2024 memorandum written by Robert Sienkiewicz, Chief of CEDSCI, and a Scope Determination and Findings ("D&F") prepared by the Contracting Officer for BLN's current task order. In his memorandum, Mr. Sienkiewicz identifies seven critical technical support services that CEDSCI will require after MetroStar's second bridge contract ends:

1. Support a modernized technology platform that leverages existing innovations to provide a set of shared data dissemination services that enable consumers to do more with the massive amounts of valuable content CEDSCI publishes year-round.

2. Maintain a process for the design and implementation of solutions to sustain operations following an interactive process to modernize the data dissemination platform seeking feedback from both internal and external stakeholders to drive continuous improvements to:

> a. Engage users early and often to understand their business and data needs.
> b. Implement a process that includes continuous stakeholder feedback.
> c. Leverage existing dissemination investments, when applicable.
> d. Create a modernized platform through a shared service operating model; and
> e. Consolidate, streamline, and eliminate the current 'siloed' approach to data dissemination.
>
> 3. Development, testing and maintenance of systems, tools and processes that support data dissemination. Includes 24 hour a day, seven days a week production operations support.
>
> 4. Participation in and support of agile digital governance processes (sprints, ceremonies, etc.).
>
> 5. Support for data and documentation dissemination functions that enable users to search across census and surveys.
>
> 6. Support for the coordination and management of CEDSCI enterprise services and processes associated with dissemination. Includes systems engineering and integration services.
>
> 7. Support for transition implementation and integration activities that enable migration to new dissemination processing operations protocols and technologies to include the documentation of product and data release procedures, schedules and governance.

Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 3, App. 10–11.

In the Contracting Officer's D&F, she identifies three tasks within BLN's existing task order as embracing most, if not all, of the necessary data dissemination work: Agile digital governance; System/software upgrades; and Data analysis and visualization. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 4, App. 14. The implication is that, although BLN's task order will

5

be modified to include new work, that work will not be beyond the scope of BLN's existing task order.

In support of its response to the plaintiff's motion for a preliminary injunction, the government submitted a declaration from Mr. Sienkiewicz, dated September 17, 2024, in which he represents that the agency's continuing needs can only be met by the provision of, at a minimum, personnel in the following six labor categories: one Project Manager Level III, two Business Analysts Level I, five Application Engineers Level II, three Subject Matter Experts Level III, one Subject Matter Expert Level II, and three Systems Engineers Level III. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 1, App. 2.

The Short-term Acquisition Memorandum outlined various options for moving forward with bridge EDDE services. The first was entering into another sole source bridge contract with the incumbent contractor, MetroStar. That option was rejected without any explanation. In defendant's response to the request for a preliminary injunction, however, it offers an explanation, namely, that the agency thought it could not legally make another such sole source bridge contract award to MetroStar because the current bridge contract was not competed.

The memorandum explores three other options: (1) hold an open competition among all GSA Multiple Award Schedule contractors for IT Professional Services; (2) hold a limited competition between MetroIBR, IgniteAction, and CTG pursuant to FAR 8.405-2(c)(3)(iii)(B); or (3) modify BLN's existing task order to include EDDE support services.

The Census Bureau rejected Option 1, stating that, though it would "maximize competition," there could potentially be over 4,000 potential vendors, and such an acquisition would take approximately 6 months to finalize—well beyond the agency's September 30 target date. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 2, App. 5. The Census Bureau rejected Option 2, stating that it would also significantly extend the procurement timeline. Additionally, the agency determined that, because MetroIBR, IgniteAction, and CTG all submitted offers to the DSDSS procurement as Contractor Teaming Arrangements ("CTA"),[4] and because the teaming

---

[4] MetroIBR is a joint venture; IgniteAction is a joint venture, as well as utilizing the CTA procedures; and CTG is utilizing the CTA procedures.

arrangement requirements were an issue in the underlying DSDSS bid protest,[5] moving forward with limited competition among the three contractors would pose significant litigation risk.

The Census Bureau ultimately selected Option 3, citing the BLN Contracting Officer's determination that BLN's task order already covered EDDE services. In response to the agency's August 13 memorandum, IgniteAction filed this protest and a motion for a preliminary injunction shortly thereafter.

DISCUSSION

Plaintiff's principal argument in favor of an injunction is that the work the agency proposes to award to BLN is not part of its existing FSS task order and cannot be made part of it by modification. The government counters that the work is within the scope of BLN's task order, and that all other options for continuing EDDE support services would hamper the Census Bureau's critical mission of providing data dissemination services to both the government and the public at-large. We are sympathetic to the agency's desire to fulfill its mission, but that desire cannot short-circuit the government's obligations under the FAR.

In deciding whether to grant preliminary injunctive relief, the court must consider four factors: (1) plaintiff's likelihood of success on the merits; (2) whether plaintiff will suffer irreparable harm without the injunction; (3) the balance of the harms between the parties; and (4) the public's interest in an injunction. *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 239 (2010). We address each in turn.

---

CTA procedures are defined by the General Service Administration ("GSA") and allow MAS contractors to team up to qualify for orders they would not otherwise qualify for on their own. *See generally*, *Team Up with Other MAS Contractors*, U.S. GEN. SERVS. ADMIN., https://www.gsa.gov/buy-through-us/purchasing-programs/multiple-award-schedule/help-with-mas-contracts-to-sell-to-government/team-up-with-other-mas-contractors (last visited Oct. 3, 2024).

[5] CTG and MetroIBR each alleged that IgniteAction did not have the requisite experience necessary to be awarded the DSDSS contract through a CTA.

I. Likelihood Of Success On The Merits

Plaintiff is likely to succeed on the merits because (1) it has shown that EDDE support services are outside the scope of BLN's task order; and (2) the Census Bureau cannot add labor categories for EDDE support services that are not offered under BLN's FSS contract.

A. EDDE Support Services are Outside the Scope of BLN's Task Order

Under FAR 8.405-2(c)(3)(i), FSS orders that exceed the simplified acquisition threshold must be solicited on a competitive basis unless waived under FAR 8.405-6. More specifically, the contracting officer must "provide the RFQ on eBuy to afford *all schedule contractors* offering the required services under the appropriate multiple-award schedule(s) an opportunity to submit a quote" or "provide the RFQ to *as many schedule contractors as practicable*, consistent with market research appropriate to the circumstances, to ensure that quotes will be received from at least three contractors that can fulfill the requirements." FAR 8.405-2(c)(3)(iii)(A)–(B) (emphasis added). Therefore, unless a FAR exception or exemption exists, agencies are required to hold a competitive procurement process for their orders. *California Indus. Facilities Res., Inc. v. United States*, 104 Fed. Cl. 589, 595 (2012).

Though competition is generally required, the Competition in Contracting Act (CICA) "does not prevent modification of a contract by requiring a new bid procedure for every change." *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). The BLN task order Contracting Officer's D&F attempts to rely on FAR 52.243-3(a)(1) to justify incorporating EDDE support services into BLN's current task order. The provision states, in relevant part, that "[t]he Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes *within the general scope of this contract* in any one or more of the following: . . . (1) Description of services to be performed . . . ." FAR 52.243-3(a)(1) (emphasis added). The question, therefore, is whether the EDDE requirements are within the scope of BLN's contract. As explained below, we conclude that they are not.

An agency's modification to an existing contract is outside the scope of that contract if the modification constitutes a cardinal change. *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563–64 (Ct. Cl. 1978) ("a cardinal change . . . . occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for."). The cardinal change doctrine was originally developed to provide a remedy for contractors directed to perform services beyond the scope of the original contract. *Id.* Within the bid protest context, however, the cardinal change doctrine is applied when the government's modifications to an existing contract circumvents competition for those additional services. *AT&T*, 1 F.3d at 1205 ("This case does not ask whether Government modifications breached a contract, but asks instead whether Government modifications changed the contract enough to circumvent the statutory requirement of competition.").

Generally, a modification is within the scope of the original contract if, by an objective standard, bidders to the original contract would have reasonably expected the modification to fall within its terms. *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 274 (2012); *Northrop Grumman Corp. v. U.S.*, 50 Fed. Cl. 443, 465 (2001). In determining whether bidders were on notice of the modification, and thus, whether the modification is within the scope of the original contract, "[t]he court's analysis takes the entire original procurement into account." *Northrop Grumman*, 50 Fed. Cl. at 465. The court must look at the "totality of the change," which is a fact-based determination, varying from contract to contract. *Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969). In situations where fundamental contractual modifications are made along with significant price increases, we have deemed the modifications to be cardinal changes. *Id.* at 278–79; *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 109 (2004) (finding the contract modification a cardinal change when the government "increased the cost of the original contract by nearly eighty percent."). However, when comparing the modification to the original contract, the court "must look beyond simple arithmetic" in determining whether the modification is truly within scope. *PCL Const. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 806 (2000) (citation omitted). The court has recognized other factors, including changes in the type of product or service, quantity of work, and performance period. *Northrop Grumman*, 50 Fed. Cl. at 466 (citation omitted). We have held a contract modification to be beyond the original contract's scope where, in addition to other factors, the modification changes the contractor's government clientele. *See CCL, Inc. v. United States*, 39 Fed. Cl. 780, 792

9

(1997) (finding a contract modification beyond the scope of the original contract where "the modification increased the number of 'client' entities from a single agency within the Air Force to several agencies within DoD across all service boundaries."). GAO has considered both direct and circumstantial evidence, including the "plain language of the solicitation," as well as the "circumstances attending the procurement that was conducted; . . . changes in the type of work, performance period, and costs between the contract as awarded and as modified; . . . and [] whether the modification could have changed the field of competition." *Leupold Stevens, Inc.*, B-417796, 2019 WL 6464239, at *4 (Comp. Gen. Oct. 30, 2019).

Here, in determining that EDDE services were within the scope of BLN's task order, the only analysis conducted by the Contracting Officer in the D&F was whether there was sufficient money in the task order budget and whether the modification would affect the task order performance period. While not irrelevant, this says nothing about the substance of the work.

After comparing both documents, we do not believe EDDE support services are within the scope of BLN's task order. BLN's task order is focused on providing support for web services, involving "web analytics, customer service principles, [and] search engine optimization analysis." Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 5, App. 23. More specifically, the task order supports the Census Bureau's website, census.gov, the agency's data platform, data.census.gov, and its three key systems, "Adobe Experience Manager (AEM) Content Management System (CMS)," "Customer Experience Management (CEM)," and "Web traffic and feedback analysis." Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 5, App. 22–23. On the other hand, the EDDE contract involves enterprise-wide IT services to CEDSCI's data dissemination efforts that are not included in BLN's task order. These services include back-end software development support, production operations support through *all* environments, systems engineering and integration services, systems design, configuration management, functional and integration testing, incident and problem management, IT security engineering and information security architecture support, performance engineering, and interface development support. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 9, App. 201–11. Additionally, under the "Requirements" section of the EDDE Contract, the contractor is required to provide support for "Platform Architecture," "Data Architecture," and "Software Architecture," while under the BLN task order, the contractor is only responsible for "document[ing] and maintain[ing] the Data

Architecture." *Compare* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 9, App. 203–06 *with* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 5, App. 52. It is not surprising, therefore, that the "Labor Categories" of the EDDE contract include "Cloud Architect," "Data Architect," "Systems Architect – Level I," and "Systems Architect – Level II," while the BLN task order does not include any of these positions. *Compare* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 9, App. 188–89, 193 *with* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 5, App. 19–20.

Neither the August 13 Short Term Acquisition Memorandum, the August 13 Scope Determination and Findings Memorandum prepared by BLN's Contracting Officer, nor the government's response brief do any meaningful comparison between the EDDE contract requirements and BLN's task order. The BLN Contracting Officer's D&F does not acknowledge or explain how the BLN task order can satisfy the EDDE requirements beyond the identification of Agile digital governance, Systems/software upgrades, and Data analysis and visualization as task areas in the BLN contract germane to the EDDE work sought. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 4, App. 14. A comparison between those three and the five high level task areas set out in the EDDE bridge contract reveals that the only overlap is the word "agile." Absent some reasoned explanation for how that is sufficient for the agency's purposes, we cannot find a rational basis supporting the contract modification there.

More telling is Mr. Sienkiewicz's August 1 memorandum, which identifies seven technical support services CEDSCI will require after the current EDDE bridge expires. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 3, App. 10–11. We take Mr. Sienkiewicz's statements at face value—that these are the substantive services that the agency requires. The government has yet to explain how BLN's three task areas fulfill any, much less all seven of Mr. Sienkiewicz's technical support services. We are thus left to conclude that EDDE support services are not within the scope of BLN's task order.

Other factors also support that conclusion. As IgniteAction points out, at the time Census' CEDESCI office was competing the DSDSS procurement, a different office within the Census Bureau, the CNMP, was simultaneously competing the BLN task order. The BLN task order and the EDDE contract support two separate government entities within the Census Bureau, each fulfilling separate functions. The BLN task order performs services for the CNMP within the Associate Director for Communications,

11

while the EDDE contract provides support services for the CEDESCI office under the Associate Director for Research and Methodology. The procurements were backed by separate market research, and the Census Bureau's research for the DSDSS procurement did not identify, let alone consider, BLN to be a viable vendor for data dissemination services. Nor did the agency's research for BLN's task order consider MetroStar, the incumbent EDDE contractor, to be a qualified vendor for digital web services.

Additionally, under BLN's FSS contract, it is apparent that BLN does not offer the personnel to perform the services that MetroStar is currently performing under the second EDDE bridge contract. BLN's FSS labor categories do not include Business Process Specialist, any level of Computer Programmer, any level of IT Analyst, Network Specialist, or Web Portal Engineer – Level II—all labor categories MetroStar is currently providing under its EDDE bridge contract. Moreover, as mentioned above, Mr. Sienkiewicz's September 17 declaration states that, at a minimum, the personnel required to maintain 24/7 data dissemination operations include one Project Manager Level III, two Business Analysts Level I, five Application Engineers Level II, three Subject Matter Experts Level III, one Subject Matter Expert Level II, and three Systems Engineers Level III, amounting to 15 personnel. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 1, App. 2. BLN does not offer on its FSS contract labor categories that account for eight of the required personnel, including one Project Manager Level III, two Business Analysts Level I, and five Application Engineers Level II. Without the requisite personnel to perform EDDE support services, BLN could not have reasonably expected a modification of this kind. The disparity in available services and personnel reveal that EDDE support services are not within the scope of BLN's task order.

> B.  The Census Bureau Cannot Add Labor Categories Not Offered on BLN's FSS

All schedule contractors with GSA schedule contracts must publish a FSS pricelist, containing all supplies and services offered. FAR 8.402(b). Orders placed under schedule contracts in accordance with FSS procedures satisfy the full and open competition requirement. *Data Mgmt. Servs. Joint Venture v. United States*, 78 Fed. Cl. 366, 377 (2007). Accordingly, when placing an FSS order, "the contracting agency must verify that all items on the order are within the scope of the vendor's FSS contract." *Eracent, Inc. v.*

12

*United States*, 79 Fed. Cl. 427, 430 (2007). Therefore, under FAR 8.404(a), when "placing orders under Federal Supply Schedule contracts using the procedures of 8.405, ordering activities shall not seek competition outside of the Federal Supply Schedule or synopsize the requirement." *See also Kearney & Co., P.C. v. The United States*, No. 24-162, 2024 WL 2209767 (Fed. Cl. Apr. 30, 2024) ("[b]ut there is a limiter on the use of FSS contracts—the agency may seek only items that are on the FSS contract.").

The Census Bureau thus cannot modify BLN's task order to include labor categories that BLN does not offer under its FSS pricelist. As previously mentioned, Mr. Sienkiewicz identified six labor categories necessary to minimally maintain EDDE services after the current bridge contract with MetroStar ends. BLN's FSS pricelist for SIN 54151S does not, however, include three of those labor categories: Project Manager Level III, Business Analyst Level I, and Application Engineer Level II. Pl.'s Mot. for Prelim. Inj. Ex. 11. Thus, under the FAR, any modification to BLN's existing task order could not legally contain the full number of labor categories necessary to minimally maintain data dissemination support services for CEDSCI.

In sum, plaintiff has demonstrated a high likelihood that it will be successful on the merits of its protest. We thus turn to the other factors to see whether an injunction is appropriate.

C. Irreparable Harm

To demonstrate irreparable injury, "a plaintiff must show that without a preliminary injunction it will suffer irreparable harm before a decision can be rendered on the merits." *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009). The court will inquire "whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993). Though the mere loss of money will not constitute irreparable harm, a "lost opportunity to compete in a fair competitive bidding process for a contract . . . has been found sufficient to prove irreparable harm." *Overstreet Elec. Co. v. United States*, 47 Fed.Cl. 728, 744 (2000); *see also Navient Sols., LLC v. United States*, 141 Fed. Cl. 181, 184 (2018) ("Losing an opportunity to compete may constitute irreparable harm.").

Here, plaintiff has sufficiently established irreparable harm. IgniteAction is the current awardee for the DSDSS task order, the follow-on

13

contract to replace EDDE support services, and it has expressed its desire to compete for the next EDDE bridge contract. If BLN's task order is modified to include EDDE support services, there will be no competitive procurement process. The fact that IgniteAction will lose *any* opportunity to participate in a competitive procurement process for the bridge contract is enough to show irreparable harm.

   D. Balance of the Harms

When determining whether to grant a preliminary injunction, we must balance the harms IgniteAction would experience without injunctive relief against the harms the Census Bureau would experience if a preliminary injunction were granted. *Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 670 (2010). The government contends that competing the EDDE bridge services, even in a competition limited to MetroIBR, CTG and Ignite Action, would cause significant delays in maintaining critical data dissemination services, in large measure due to the agency's assumption that such a competition would generate litigation. We accept the importance of continuing services, but means are available within the law for expedited and limited competition, and, as we explained at oral argument, perhaps even for a sole source renewal of the current bridge contract.[6] In addition, we give no weight to the agency's concern that using competitive means to make an award might generate litigation. The current bridge contract expires at the end of November. If that is a short period, even for a limited competition, we view that dilemma to be of the agency's making. In any event, the court is able to give expedited consideration to protests.

   E. Injunction Serves the Public Interest

Generally, it is well settled that "the public has a strong interest in ensuring that the government procurement process is fair." *Progressive*

---

[6] For the logical follow-on exception to apply "the original order or BPA must not have been previously issued under sole-source or limited-sources procedures." FAR 8.405-6(a)(1)(i)(C). Defendant takes the position that it cannot award a successive sole source contract under the logical follow-on exception because the "original order" refers to the previously awarded bridge contracts, which were not competed. As we explained at oral argument, our view is that "original order" refers to the initial EDDE contract awarded to MetroStar, which involved a competitive procurement.

*Indus., Inc. v. United States*, 129 Fed. Cl. 457, 486 (2016). This involves "requiring the government to follow its procurement regulations." *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146 (2020) (citation and internal quotation marks omitted). The Census Bureau is required to compete the next EDDE bridge contract unless an enumerated FAR exception exists. The one chosen by the agency we conclude is improper, and the Census Bureau is not without options. As a result, granting this preliminary injunction serves the public interest.

F.  The Government's Bond Request

Lastly, the government contends that, if the court grants this preliminary injunction preventing the agency from modifying BLN's task order, the Census Bureau would incur $21,783/month in increased costs for maintaining EDDE support services, amounting to more than $130,000 over six months. Accordingly, the government requests an order requiring IgniteAction to post bond for $130,698.

Posting of a bond is governed under Rule 65(c) of the Rules of the Court of Federal Claims ("RCFC"), which provides that:

> [t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Generally, the amount of a bond is "within the sound discretion of a trial court." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006). The court's discretion includes "'dispens[ing] with the bond requirement where there has been no proof of likelihood of harm' to those enjoined." *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 837 (Fed. Cir. 2020) (quoting *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004)). Additionally, the court will not require a bond amount where the enjoined party's claimed damages are remote or speculative. *See CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 1996 WL 338388, at *3 (Fed. Cir. June 19, 1996) (upholding district court's fact determination that petitioner's alleged damages for a bond "were either speculative and remote or grossly overstated").

Here, the government's bond request is based on a speculative calculus. Though the government claims the bond amount should be the difference between the cost of maintaining EDDE services through a BLN contract modification and awarding MetroStar another sole-source bridge contract, there is no certainty that the government will move forward with awarding MetroStar another sole-source bridge. The government could alternatively conduct a limited competition between IgniteAction, MetroStar, and CTG, which could potentially bring the total cost of maintaining EDDE services below that of the proposed BLN modification. The premise behind the government's calculus of a bond is thus unfounded. It has not established that it will be harmed by the temporary injunction.

## CONCLUSION

The Census Bureau's proposed modifications to BLN's FSS task order goes beyond the scope of that order. It is therefore not available as an alternative to a competitive procurement and plaintiff has thus demonstrated a likelihood of success on the merits. Plaintiff will suffer irreparable harm without the injunction and the balance of the harms favors the plaintiff. The public has an interest in maintaining the integrity of the procurement system. Accordingly, plaintiff has shown an entitlement to a preliminary injunction. The following is thus ordered:

1. The agency is hereby enjoined from modifying BLN's existing task order to encompass the EDDE support services pending further order of the court.

2. Plaintiff shall file its motion for a permanent injunction on or before October 23, 2024.

3. Defendant shall file its response in opposition to plaintiff's motion for a permanent injunction on or before November 6, 2024.

4. Plaintiff shall file its reply in support on or before November 13, 2024.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge
